A. Don **CROWDER** et ux., Appellants,

v.

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF DALLAS,**
Appellees.

No. 1110.

Court of Civil Appeals of Texas, Tyler.

May 18, 1978.

Rehearing Denied June 22, 1978.

Michael Greenberg, Irving, for appellants.

Michael W. McManus, Weinberg, Sandoloski & McManus, Dallas, for appellees.

MOORE, Justice.

This is an appeal from a summary judgment. Plaintiffs, A. Don Crowder and wife, executed two secondary mortgages on their homestead securing loans for the construction of a swimming pool and a tennis court. The mortgage instruments were then assigned to defendant, First Federal Savings & Loan Association of Dallas (First Federal). Plaintiffs, although not in default on the notes, brought suit against defendant, First Federal, alleging that the notes and the mortgage instruments securing the same were in violation of Tex.Rev. Civ.Stat.Ann. art. 5069–5.02(5), commonly known as the Consumer Credit Code (Code), in that the instruments provided for a payment of a 15% attorney's fee in the event plaintiffs defaulted in the payment of the loan. Plaintiffs alleged that the charging of attorney's fees was not authorized by the Code and sought judgment for the statutory penalties provided for under articles 5069–8.01 and 8.02. Both parties filed motions for summary judgment. After a hearing, the trial court granted First Federal's motion for summary judgment, denied plaintiffs' motion and entered a take-nothing judgment against them, from which adverse ruling plaintiffs perfected this appeal.

We affirm.

The question presented is whether a provision in a note and secondary mortgage contract in which the mortgagor agrees to pay a 15% attorney's fee in the event of default constitutes a violation of article 5069–5.02(5), thereby entitling the mortgagor to the statutory penalties provided for in the act. The determination of the question calls for a construction of the Code as a whole.

The Consumer Credit Code is found in subtitle 2 of Title 79 in the Revised Civil Statutes of this state. Under the first subtitle, article 5069–1.02, the act provides as follows:

"Except as otherwise fixed by law, the maximum rate of interest shall be ten percent per annum. A greater rate of interest than ten percent per annum unless otherwise authorized by law shall be deemed usurious. All contracts for usury are contrary to public policy and shall be subject to the appropriate penalties prescribed in Article 1.06 of this Subtitle."

The second subtitle provides that in certain types of consumer loans the lender may charge interest in excess of ten percent per annum but prohibits the lender from making additional charges. It also contains certain disclosure requirements. The loan in the present case is classified as a consumer loan and falls under chapter 5 of the second subtitle, and is regulated by the provisions of article 5069–5.01 et seq., titled "Secondary Mortgage Loans." Chapter 8 (articles 5069–8.01 and 8.02) provides certain penalties applicable to violations of subtitle 2.

Section 5.01(1) of the article authorizes the taking of secondary liens on real property improved by a dwelling designed for occupancy by four families or less. Section 5.02 places limitations on the amount of add-on interest, interest for default and other fees which may be contracted for, charged or received. Section 5.02(5) reads as follows:

"In addition to the authorized charges provided in this Chapter no further or other charge[s] or amount whatsoever shall be directly, or indirectly, charged, contracted for, or received. This includes (but is not limited by) all charges such as fees, compensation, bonuses, commissions, brokerage, discounts, expenses and every other charge of any nature whatsoever, whether of the types listed herein or not. Without limitation of the foregoing, such charges may be any form of costs or compensation whether contracted for or not, received by the lender, or any other person, in connection with (a) the investigating, arranging, negotiation, procuring, guaranteeing, making, servicing, *collecting or enforcing of a loan;* or (b) for the forbearance of money, credit, goods or things in action; or (c) for any other

service or services performed or offered. However, the prohibition set out herein shall not apply to amounts actually incurred by a lender as: . . ." (Emphasis supplied.)

Immediately following the foregoing section the statute lists a group of six charges which are *not* prohibited, including fees for appraisal and inspection; investigation of credit standing; filing, recording and construction permits; insurance; title examination; and legal fees to an attorney who is not a salaried employee of the lender for the preparation of documents in connection with the transaction, not to exceed $35. In short, in addition to expressly listing certain charges which are prohibited, the statute appears to prohibit "all charges whatsoever" in connection with the collecting or enforcing of a loan, except those few which are expressly permitted. It should be noted, however, that the statute does not specifically prohibit contracting for attorney's fees in the event of default. It simply makes no reference to attorney's fees in the event of default.

The undisputed summary judgment proof shows that, prior to the construction of the improvements on their home, plaintiffs made arrangements with First Federal on two different occasions for financing of the swimming pool and tennis court. The summary judgment proof further shows that First Federal prepared the notes and other instruments necessary to perfect the second mortgage lien. After being executed by plaintiffs the notes were simultaneously assigned to First Federal by the contractors. The two notes executed by the plaintiffs provide for attorney's fees in the event of default in the following language:

"If this note is placed in the hands of an attorney for collection, or if it is collected through judicial proceedings, bankruptcy proceedings or through the probate court, then I, we, or either of us, agree to pay an additional 15% of the principal and interest then due as attorney's fees . . . ."

Plaintiffs assert that because section 5.02(5) does not expressly set forth the right

to contract for, charge or receive attorney's fees upon default, the notes and mechanic's lien contracts assigned to First Federal contain charges prohibited under section 5.02(5). They further argue that the agreement to pay a 15% attorney's fee constitutes a contract obligating them to pay for the cost of collecting and enforcing the loan, which additional charge is specifically prohibited by the statute. Therefore they contend that such violation triggers the penalty provisions of the act, sections 8.01 and 8.02,[1] and that they are entitled to recover for the amount of penalties specified therein. We are not in accord with this proposition.

In construing the meaning of a statute, the dominant consideration is to ascertain the intention of the legislature. *Southwestern Investment Company v. Mannix,* 557 S.W.2d 755 (Tex.1977); *Flowers v. Dempsey-Tegeler & Company,* 472 S.W.2d 112 (Tex.1971). In determining the legislative intent, the court must at all times keep in mind the old law, the evil and the remedy. Tex.Rev.Civ.Stat.Ann. art. 10, sec. 6; *O. R. Mitchell Motors, Inc. v. Bell,* 528 S.W.2d 856 (Tex.Civ.App.—San Antonio 1974, writ ref'd n. r. e.). That is to say that the courts must consider the history of the subject matter involved, the end to be attained, the mischief to be remedied and the purpose to be accomplished. *McDaniel v. Pettigrew,* 536 S.W.2d 611 (Tex.Civ.App.—Dallas 1976, writ ref'd n. r. e.).

In construing the present statute we believe it particularly appropriate to examine the "Declaration of Legislative Intent" as set out at the beginning of the act. Among other things the Declaration of Intent recites that: (a) the regulation of credit abuses and the imposition of penalties are presently insufficient; (b) such abuses are especially prevalent in the area of consumer transactions; (c) these facts conclusively indicate a need for a comprehensive code to define interest and usury, to classify and regulate loans and lenders, to place limitations on charges imposed in connection with credit sales and services, to prohibit deceptive trade practices and to provide effective penalties for usury and other prohibited practices.

Thus, it is clear from a reading of the declaration that the Code's primary purposes are to (1) regulate interest rates and (2) prohibit deceptive and abusive practices in connection with the lending of money.

Before the Consumer Credit Code was enacted in 1967, any loan with an effective rate of interest greater than 10% per annum was considered usurious. Under the Credit Code, lenders are now permitted to charge effective rates of interest greater than 10% per annum, provided they comply with the requirements under the Code. Thus, lenders may choose between charging up to 10% per annum free of restrictions (under subtitle 1), or charging an effective rate of interest greater than 10% and be subject to the relevant regulations under the Credit Code. See *Anguiano v. Jim Walter Homes, Inc.,* 561 S.W.2d 249, 252 (Tex. Civ.App.—San Antonio 1978). In furtherance of our inquiry into the intent of the legislature, we must look to the "old law" in order to determine the mischief to be remedied. This calls for an examination of the relevant pre-code case law that has developed under the usury statute prohibiting interest in excess of 10% per annum, currently art. 5069–1.02, supra.

Under what is now art. 5069–1.02, the basic usury statute, our courts have held that the inclusion of certain additional charges other than the interest charges shown on the face of the loan often amounted to a means by which a greater rate of interest was illegally exacted. Such charges were thus considered interest, and if they, in conjunction with the express rate of interest on the face of the loan, raised the effective rate of return to an amount greater than 10% per annum, the loan was usurious. Examples of such additional charges which the courts have condemned include brokerage fees, bonuses, commis-

---

1. Although these provisions were revised and enlarged in 1977, plaintiffs brought suit to recover under the original penalty provisions enacted in 1967.

sions, expenses, discounting, and "fees" (i. e., for the use of lender's credit). Under sec. 5.02(5) of the new code, each of the foregoing charges are explicitly prohibited. Without doubt the legislature was aware of the fact that lenders had previously resorted to such means as a cover for charging usurious interest. Therefore, in passing the Consumer Credit Code, the legislature merely attempted to codify the case law by prohibiting the charging of or contracting for additional fees and services such as those previously enumerated.

On the other hand, the courts of this state have not been prone to classify attorney's fees as an additional charge causing a contract to be usurious. Our courts have consistently upheld the right of the parties to contract for attorney's fees in the event of default, and have further held that such fees are not to be considered as interest so as to make a contract usurious. *Stuart v. Tenison Bros. Saddlery Co.*, 21 Tex.Civ.App. 530, 53 S.W. 83 (1899), writ ref'd; *Childs v. Juenger,* 162 S.W. 474 (Tex.Civ.App.—San Antonio 1913, writ ref'd). See *Moss v. Metropolitan Nat. Bank of Houston,* 533 S.W.2d 397 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ history); *Houston Furniture Distributors, Inc. v. Bank of Woodlake,* 562 S.W.2d 880 (Tex.Civ.App.—Houston [1st Dist.] 1978).

Thus, under the pre-code law, attorney's fees in the event of default, unlike other charges, have always been viewed as appropriate, and the contracting for such fees has never been considered an evil in need of remedying. It is inconceivable that the legislature would have concluded that the contracting for attorney's fees in the event of default amounted to a deceptive or abusive practice, when such practice has never been considered deceptive or abusive or potentially usurious by the courts. Clearly, then, the legislature did not intend to view the contracting for or charging of attorney's fees in the event of default as an evil which needed remedying under the "new law," the Consumer Credit Code. Had it so intended it could easily have prohibited such fees in explicit language.

In *Southwestern Investment Co. v. Mannix,* supra, the court stated that a fundamental rule of statutory construction is that the intention of the legislature must be ascertained from the entire act and not from isolated portions thereof. With this rule of construction in mind, we note that in every type of loan or credit sale regulated by the act, with the exception of secondary mortgage loans, the act specifically recognizes the right to contract for attorney's fees in the event of default. In chapters 3 and 4 the legislature specifically provided that the general prohibition against the charging of or contracting for additional fees did not apply to attorney's fees. For example, both sec. 3.15 dealing with regulated loans and sec. 4.01 dealing with installment loans prohibit the lender from contracting for additional charges in the collecting or enforcing of a loan. However, despite such prohibition, the legislature specifically provided that the prohibition against additional charges in those sections did not apply to amounts actually incurred as attorney's fees assessed by a court. In addition, sec. 6.03 dealing with retail installment sales and sec. 7.03 dealing with vehicle installment sales both permit contracting for a reasonable attorney's fee where the contract is referred for collection to an attorney not a salaried employee of the holder of the contract.

After a review of subtitle 2 as a whole, it is apparent that contracting for attorney's fees upon default was not one of the evils sought to be corrected by the legislature. The legislature apparently viewed such fees as a legitimate charge to be imposed on the defaulting buyer who gives rise to the expense, rather than as a cost of doing business to be borne by the lender.

We see no valid reason why secondary mortgage loans should be singled out by the legislature as the only type of transaction in which attorney's fees would be prohibited. On the contrary, we think that by failing to address itself explicitly to the question of attorney's fees, the legislature intended to leave the parties free to contract for attorney's fees as in the other

sections of the Code. Not only does lending money secured only by a second mortgage loan involve great risks, but the enforcement of a second mortgage loan is often a complicated affair requiring much time and effort on the part of an attorney. Thus, viewing the act as a whole as opposed to isolated portions thereof, we do not believe that the legislature purposely intended to single out secondary mortgage lenders and prohibit them from contracting for or charging attorney's fees on default.

Although the sweeping language of sec. 5.02(5) seems to prohibit "all charges whatsoever" in connection with the collecting or enforcing of a loan except for those few which are explicitly allowed, we do not believe that it was the legislative intent, as gathered from the Declaration of Legislative Intent, the history of the subject matter, the purpose to be accomplished and the act as a whole, to declare that the contracting for attorney's fees in secondary mortgage loans constituted a usurious practice or amounted to an abusive or deceptive practice which the act was designed to prohibit. It was not necessary for the legislature specifically to grant the lender the right to contract for attorney's fees on default, since such right has traditionally been recognized by the courts of this state. We hold that the conduct of appellee in contracting for attorney's fees does not constitute a violation of art. 5069–5.02(5) of the Consumer Credit Code. It therefore follows that appellee would not be subject to the penalty provisions provided in the act.

The judgment of the trial court is affirmed.